Davis, J.,
delivered the opinion of the court:
The Third National Bank of Chicago becoming insolvent,, the claimant was appointed receiver in November, 1877. When the taxes for the half year ending December 31,1877, became-due, the return required by section 5215 of the Revised Statutes, was not made, and thereupon the Treasurer of the United States, acting under sections 5216 and 5217, made an assessment against the bank, and on the 14th of June, 1879, covered the sum so assessed into the Treasury, against the protest of the- • Comptroller of the Currency. The funds so covered in were-taken by the Treasurer from moneys belonging to the 5 per cent.. redemption fund of the bank. Between December 31,1877, and the date when the money was actually covered in, but after the Treasurer had made the assessment, the act of March 3, 1879*. was passed (20 Stat. L., p. 352). This act contained the following provision:
“ That whenever and after any bank h¿is ceased to do business by reason of insolvency or bankruptcy, no tax shall be assessed, collected, or paid into the Treasury of the United States, on account of such bank, which shall diminish the assets, thereof necessary for the full payment of all its depositors, and. such tax shall be abated from such national banks as are found, by the Comptroller of the Currency to be insolvent.”
In Johnston’s Case (17 C. Cls. R., 157) this court, speaking by-Judge Richardson, held that the act of March 3, 1879, abated *304 taxes assessed before the passage of the act but not paid when the act took effect.” This- point, therefore, need not be considered 5 but there remains a material distinction between the case •at bar and that of Johnston, in that in Johnston’s Case the ..amount covered in was necessary to pay the depositors in full, whereas in this case it would go to the stockholders. The defendant has set up a counter-claim for the sum assessed as taxes • due the United States. That this counter-claim is properly introduced has' been decided in Boughton v. The United States (13 C. Cla. R., 284).
The act of 1879, divested of words not necessary to the consideration of this case, provides that when a bank has stopped ¡business because of insolvency no tax shall be paid into the Treasury which shall diminish the assets “ necessary for the full payment of all its depositors,” and such tax shall be abated from insolvent banks. Uo ambiguity appears in the statute; the taxes not to be paid are those only which shall diminish as.-sets necessary to pay depositors j and the word “ such ” in the •concluding clause relates to the definition of the preceding •clause, that is to those taxes, and to those only, whose payment will diminish the depositors’ fund. This interpretation of the .act has already been, in effect, given it in Johnston’s Case, where the court says (p. 172):
“The act of March 3,1879, now under consideration, was •passed for the undoubted purpose of relieving depositors in national banks from the payment of certain taxes not assessed ¡upon them, but upon the banks of which they are only customers — taxes which, under the pre-existing law, they would in-•direetly be obliged to pay when a bank is so insolvent that all its capital is gone, and it has nothing left with which to pay taxes except the money of its depositors. These semi-annual taxes are assessed against national banks in their corporate •capacity, upon their capital and business, in consideration of the franchise and benefits which the government grants to them, -and for other reasons. They are expected to come out of the ¡profits of the bank, and thus, reducing the dividends of the .-stockholders, they are atax upon the proprietors of the institu-vtion.”
It was clearly the intention of the statute to relieve the innocent customers of the bank, between whom and the govern;ment there Were no relations of tax-payer and tax-receiver, and mot to relieve the owners of the institution from their just liabilities.
*305 Before the semi-annual tax became due, the bank had passed into the hands of a receiver and under tbe control of the Comptroller of the Currency. It became then the duty of that officer, under section 5234 of the Revised Statutes, and through the receiver, to take possession of all assets of the association and debts due it, and, if necessary, to enforce the individual liability of the stockholders; all moneys thus received to be paid to the Treasurer of the United States, “ subject to the order of the Comptroller.” By section 523(1 the Comptroller is directed, after providing for the redemption of the outstanding notes of the bank, to make a ratable dividend of the money paid over to him by the receiver “ on all such claims as may have been proved to him to his satisfaction or adjudicated in a court of competent jurisdiction,” and to continue this course as from time to time moneys come in from the receiver. The iiitent of this and other sections of the Revised Statutes bearing upon insolvent national banks is to throw the entire control into the hands of the Comptroller of the Currency, to centralize the power and responsibility, for the purpose of facilitating the winding up of the affairs of the association and the payment of its obligations.. The power and duty of the Treasurer to,, collect taxes become then subject to the general power of the Comptroller over the insolvent bank; the Treasurer represents, the United States as a creditor, while the Comptroller is the-embodiment of their visitorial power over corporations created, by the government.
In the winding up of this bank the United States had no. right, of priority over other creditors (Cook County National Bank v. The United States, 107 U. S. R. 445), and still less had they a lien upon funds in the hands of the Treasurer there deposited for a specified purpose.
The sum covered in by the Treasurer to pay this tax was taken from the fund described in the act of June 30,1874, as follows:
“Any association organized or to be organized under the provisions of said act, and of the several acts amendatory thereof, shall, at all times, keep and have on deposit in the Treasury of the United States, in lawful money of the United States, a sum equal to five per' centum of its circulation, to be held and used for the redemption of such circulation, which sum shall be counted as a part of its lawful reserve, as provided in section 2 of this act.”
*306 By this act the Treasurer became a trustee charged with the care of the fund, which was to be held for one purpose only— that of redeeming the circulating notes. The bank having failed to redeem its notes passes into the hands of the Comptroller of the Currency, and the 5 per cent, fund becomes liable for the redemption of these notes, the contingency contemplated by the statute having arisen. But the Treasurer has no power over the fund, for the Comptroller is directed by section 5234 to take possession of “ assets of every description,” and section 5236 directs that after provision has been made for refunding to the United States “ any deficiency in redeeming the notes of such association the Comptroller shall make a ratable dividend among the creditors.” Bo prioi'ity is given any creditor except (section 5230) to the United States for one purpose, to wit, the redemption of the circulating notes, and the whole matter is placed in the charge of the Comptroller of the Currency. The Treasurer, therefore, had no power to touch this 5 per cent, redemption unless for one purpose, the redemption of the bank’s notes.
Section 5214 of the Revised Statutes provides that in the months of January and July every association shall pay to the Treasurer certain duties in lieu of all existing taxes, and section 5215 requires from each association, within ten days from the 1st days of January and July, a return, under the oath of the president or cashier, of certain facts necessary to make the assessment; failing this, the Treasurer is directed by section 5216 to make the assessment, and upon failure to pay he may (by section 5217) collect the sums due in the manner provided for the collection of United States taxes from other corporations, “ or the Treasurer may reserve the amount out of the interest as it may become due on the bonds, deposited with him by such defaulting association.”
No return coming from the bank, the assessment was made by the Treasurer on the 12th January, 1878, after the ten days bad expired, and on the same day he charged it against the 5 per cent, redemption fund. Here we have a technical compliance with the statute as far as the assessment is concerned, but some six weeks before the bank had become insolvent, had passed into the hand of the receiver appointed by the Comptroller, and its president and cashier were no longer in aposi-tiou to fulfill the requirements of the statute. The whole status *307 contemplated by the law, to wit, a solvent bank neglecting- or refusing to furnish a sworn return, had long ceased to exist, and the penalty imposed by sections 5216 and 5217 became useless and inoperative. Neither was there reason for enforcing it, the bank being in the hands of officers of the United States, who had possession of all its assets, books, and papers, who alone were in position to make the return, and who alone had power to'pay the tax.
It is not necessary to decide how much, if anything, the defendants are entitled to recover for taxes due between July 1, 1877, and November 24,1877, when the receiver was appointed; the United States, having no lien therefor on the fund in the hands of the Treasurer, from which the money was taken, and having no priority over other creditors, must take from the Comptroller (into whose hands any recovery in this action will go), as do other creditors, its pro rata share of the net assets. There is nothing before us by which we can determine what that would be, and therefore, without prejudice to the right of the defendants to receive that sum, should the Comptroller consider the claim proved to his satisfaction, judgment will be entered for the claimant in the sum of $6,362.89.